UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| KRISTI H. THOMPSON,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG,<br><br>Defendant. | **CIV. NO. 18-4011**<br><br>**MEMORANDUM OPINION AND ORDER GRANTING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY OF ELLIOTT FLOOD, GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT ANDERSON, AND GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, Kristi H. Thompson ("Thompson") filed a complaint against Defendant, National Union Fire Insurance Company of Pittsburg's ("National Union") alleging claims for breach of contract and bad faith denial of workers' compensation benefits. Pending before the Court is Thompson's Motion to Exclude National Union's Expert Testimony of Robert Anderson, Doc. 52; National Union's Motion for Summary Judgment, Doc. 55; and National Union's Motion to Exclude Expert Testimony of Elliott S. Flood, Doc. 59.  For the following reasons, National Union's Motion to Exclude Expert Testimony of Elliott S. Flood is granted in part; Thompson's Motion to Exclude National Union's Expert Testimony of Robert Anderson is granted in part and denied in part; and National Union's Motion for Summary Judgment is granted in part and denied in part.

**BACKGROUND**

**JC Penney Incident & Employment**

On February 21, 2011, Plaintiff, Kristi Thompson ("Thompson") was employed by JC Penney in Brookings, South Dakota, as a manager in its jewelry department.  (Docs. 56, ¶ 1; 67, ¶ 1).  While working in a back room, Thompson bent down to open the door of jewelry safe.  (Docs. 56, ¶ 2; 67, ¶ 2).  As she stood up, Thompson struck her head on a cabinet that was above the area where the safe was located.  (Docs. 56, ¶ 3; 67, ¶ 3).

Thompson provided notice to her employer of the incident, but did not seek immediate medical attention. (Docs. 56, ¶ 5; 67, ¶ 5). Thompson continued to work the day of the incident, was able to drive herself home, and returned to work the following day. (Docs. 56, ¶ 6; 67, ¶ 6).

Thompson does not recall missing any work at JC Penney due to the February 21, 2011 work incident. (Docs. 56, ¶ 19; 67, ¶ 19). While she was working at JC Penney, Thompson worked a second job, working as much as 60 hours per week, but struggled to work the same shifts as she had done prior to the JC Penney incident due to her pain. (Docs. 56, ¶ 20; 67, ¶ 20).

On January 18, 2012, Thompson resigned from her position with JC Penney. (Docs. 56, ¶ 59; 67, ¶ 59). Thompson's husband had been offered a job in Sioux Falls and Thompson had requested a transfer to the Sioux Falls JC Penney, but her request was not granted. (Doc. 58-3, DOL Transcript 230:15-24). In exit paperwork provided to JC Penney, Thompson indicated that she resigned because "We have moved to Sioux Falls and wanted to transfer but [Ms.] Cambern told me I could not transfer. I really like JC Penney and felt it was a great company to work for, but again, I was told I was unable to transfer." (Doc. 58-3, Ex. G at 22). Thompson had been an employee of JC Penney since November 3, 2009. (Doc. 58-9, Ex. G at 20).

## Workers' Compensation Claims

In February 2011, Defendant National Union was the workers' compensation insurance carrier for Thompson's employer, JC Penney. (Docs. 56, ¶ 7; 67, ¶ 7). Pursuant to a contractual arrangement, Thompson's claim was administered by a third-party administrator, Sedgwick Claims Management Services, Inc. ("Sedgwick"). (Docs. 56, ¶ 8; 67; ¶ 8).

Thompson's first post-accident visit to a medical provider was on February 23, 2011, when she visited her chiropractor at Brookings Chiropractic. (Docs 56, ¶ 10; 67, ¶ 10). Thompson's chiropractic records indicate that she described to her chiropractor that when she hit her head underneath the cabinet, it caused immediate pain to her head and neck and left a bump on the top of her head. (Doc. 58-4, Ex. C-2 at 23). Thompson said that at times, the pain in her neck was "a sharp shooting pain" and that she was also experiencing pain in her left upper back and shoulder and a lot of tightness. (Doc. 58-4, Ex. C-2 at 23). Thompson continued with intermittent chiropractic care through May 2, 2011. (Docs. 56, ¶ 11; 67, ¶ 11). Thompson then had a gap in receiving care while Thompson was waiting for a worker's compensation case manager to approve treatment. (Docs. 56, ¶ 12; 67, ¶ 12).

On July 22, 2011, Thompson underwent a cervical MRI which revealed degenerative disc changes at multiple levels in Thompson's cervical spine. (Docs. 56, ¶¶ 12-13; 67, ¶¶ 12-13).

Thompson's first appointment with a medical doctor for her neck pain was on August 2, 2011. (Docs. 56, ¶ 14; 67, ¶ 14). Thompson reported to Dr. Merritt Warren ("Dr. Warren"), her primary physician of 25 years, that she had hit her head on the bottom of the countertop after closing the safe, and that afterward, she noted "immediate neck pain and a 'migraine' headache." (Doc. 58-4, Ex. C-2 at 1). Thompson told Dr. Warren that after hitting her head, she was dazed, but not unconscious. (Doc. 58-7, Ex. E., Warren Dep. 15:11-15). Dr. Warren reviewed the July 22, 2011 MRI and noted that it showed degenerative joint disease. (Doc. 58-7, 43:15-25). Dr. Warren prescribed Thompson a muscle relaxant and referred her to physical therapy. (Docs. 56, ¶ 16; 67, ¶ 16). While Thompson reported to Dr. Warren on August 30, 2011, that physical therapy was slowly helping her condition, subsequent notes by Dr. Warren indicate that Thompson's pain subsequently increased. (Docs. 56, ¶ 18; 67, ¶ 18).

**Thompson's Prior Medical History**

Prior to the February 21, 2011 incident, Thompson had a history of neck problems and treatment for neck pain. (Docs. 56, ¶ 25; 67, ¶ 25). In 1999, Thompson treated with an Avera physician for right neck pain and decreased range of motion in her cervical spine. (Docs. 56, ¶ 26; 67, ¶ 26). Thompson reported neck pain again in 2000. (Docs. 56, ¶ 27; 67, ¶ 27). In late 2003-early 2004, Thompson saw Dr. Warren and reported left neck pain of almost a month's duration. (Docs. 56, ¶ 28; 67, ¶ 28).

In October 2005, Thompson was evaluated at the Orthopedic Institute for complaints of pain in her neck following a motor vehicle accident. (Docs. 56, ¶ 30; 67, ¶ 30). In late 2007, Thompson began treating with Brookings Chiropractic for pain through her neck, mid back region and low back region. (Docs. 56, ¶ 31; 67, ¶ 31). In February 2008, Thompson reported a fall while walking to church which "compressed her spine and jarred her neck." (Docs. 56, ¶ 32; 67, ¶ 32). On April 18, 2008, Thompson reported a fall going down some stairs and approximately ten days later, Johnson was treated for pain on the right side of her neck. (Docs. 56, ¶¶ 33-34; 67, ¶¶ 33-34).

Thompson reported neck pain again during her next appointment on May 6, 2008. (Docs. 56, ¶ 35; 67, ¶ 35). In March 2009, Thompson returned to Brookings Chiropractic complaining of pain through her neck and upper shoulders following an incident where she hit her head on a beam

in her barn.  (Docs. 56, ¶ 36; 67, ¶ 36).  Approximately one month later, Thompson returned to Brookings Chiropractic to treat the discomfort in her neck after she had fallen off a ladder.  (Docs. 56, ¶ 37; 67, ¶ 37). On June 22, 2009, Thompson slipped off another ladder, causing "a little whipping motion to her neck" and resulting neck pain.  (Docs. 56, ¶ 38; 67, ¶ 38).  A little more than two weeks later, Thompson got into an accident with her riding mower and jarred her upper back and neck.  (Docs. 56, ¶ 39; 67, ¶ 39).  Thompson continued treatment with Brookings Chiropractic for complaints of recurring headaches and pain through her neck and upper shoulder region on August 11, 2009, September 25, 2009, November 12, 2009, and December 15, 2009. (Docs. 56, ¶ 40; 67, ¶ 40).  On January 1, 2010, Thompson reported falling off some mounds of snow and having discomfort through the right side of her neck and shoulder.  (Docs. 56, ¶ 41; 67, ¶ 41).  In December 2010, Thompson was putting up Christmas decorations on a ladder and fell off, hurting the right side of her neck.  (Docs. 56, ¶ 42; 67, ¶ 42).  Thompson's last treatment for neck pain prior to the JC Penney incident on February 21, 2011, was on January 4, 2011, with Brookings Chiropractic.  (Docs. 56, ¶ 43; 67, ¶ 43).

**First Independent Medical Examination**

In December 2011, roughly ten months after the date of injury, Sedgwick opted to have Thompson submit to an independent medical examination ("IME").  (Docs. 56, ¶ 44; 67, ¶ 44). The claims adjuster assigned to the file at that time, Laurie (Rosenberry) Talbot, contacted Integrity, a third-party vendor from Minneapolis, Minnesota, and requested a qualified physician to examine Thompson.  (Docs. 56, ¶ 45; 67, ¶ 45).  Integrity assigned Dr. Paul Cederberg.  (Docs. 56, ¶ 46; 67, ¶ 46).  Neither Sedgwick nor National Union requested that Integrity assign Dr. Cederberg to perform Thompson's IME.  (Docs. 56, ¶ 47; 67, ¶ 47).  Ms. Talbot does not recall ever using Dr. Cederberg prior to Thompson's case.  (Docs. 56, ¶ 48; 67, ¶ 48).

Dr. Cederberg is a board-certified orthopedic surgeon from St. Louis Park, Minnesota. (Docs. 56, ¶ 49; 67, ¶ 49).  Dr. Cederberg has been practicing orthopedics since the early 1980's and is licensed to practice in multiple states, including South Dakota.  (Docs. 56, ¶ 50; 67, ¶ 50). Thompson does not dispute that Dr. Cederberg was sufficiently qualified to perform her IME. (Docs. 56, ¶ 51; 67, ¶ 51).

On January 13, 2012, Dr. Cederberg met with and examined Thompson in Sioux Falls, South Dakota.  (Doc. 56, ¶ 52; 67, ¶ 52).  During his examination, Dr. Cederberg questioned Thompson about her past medical history.  (Docs. 56, ¶ 53; 67, ¶ 53).  Integrity had not given Dr.

Cederberg any of Thompson's medical records from prior to Thompson's work accident.  (Doc. 58-9, Ex. G, Cederberg Dep. 7:5-8).  According to Dr. Cederberg's report dated January 23, 2012, Thompson denied any history of neck problems prior to February 21, 2011.  (Docs. 56, ¶ 54; 67, ¶ 54).  When describing the incident at JC Penney, Thompson said she had an abrasion on top of her head, but said she did not remember ever losing consciousness, feeling nauseous or seeing stars after she hit her head.  (Doc. 58-9, Ex. G, Cederberg Dep. 7:24-8:3).

Dr. Cederberg reviewed Thompson's chiropractic records after the JC Penney incident diagnosing Thompson with a cervical sprain and strain, cervical facet syndrome with associated thoracic myofascial pain secondary to her injury at JC Penney.  (Doc. 58-9, Ex. G at 12).  Dr. Cederberg noted that Thompson had been treated by her chiropractor during 11 separate visits until May 2, 2011 and that at that time, rated her pain around 5/10.  (Doc. 58-9, Ex. G at 12).  Dr. Cederberg noted a gap in treatment from May 2, 2011, until July 27, 2011, which Thompson described was due to her workers' compensation case manager's delay in approving treatment. (Doc. 58-9, Ex. G at 12).  Dr. Cederberg reviewed Thompson's last chiropractic treatment record from July 27, 2011, which showed that Thompson was experiencing low back pain after gardening the previous day.  (Doc. 58-9, Ex. G at 12).

As part of his IME, Dr. Cederberg reviewed Thompson's July 22, 2011, cervical spine MRI which showed a straightening of the cervical spine with mild degenerative changes at C4-5, C5-6 and C6-7.  (Doc. 58-9, Ex. G at 12).  He noted that Thompson was treated at the Avera Brookings Medical Group from August 2, 2011, through December 6, 2011, and that on August 2, 2011, she had reported that she jammed her neck in February and has experienced pain in her neck.  (Doc. 58-9, Ex. G at 12).  Dr. Cederberg noted that Ms. Thompson began physical therapy at Avera Brookings Medical Clinic on August 9, 2011, with the chief complaint of left-sided neck pain and that Thompson had reported to her physical therapist that after she hit her head at JC Penney, she experienced immediate neck pain and a "migraine" along with progressive left-sided neck pain. (Doc. 58-9, Ex. G at 12).   Dr. Cederberg stated that the records showed a Job Accommodation request dated August 30, 2011, requesting various accommodations due to Ms. Thompson's neck pain and that an October 10, 2011, Avera Medical Group clinic note indicated that Thompson continued to experience severe pain and stiffness in her left neck despite ibprofen, muscle relaxants, and physical therapy.  (Doc. 58-9, Ex. G at 13).  Dr. Cederberg reviewed Thompson's October 27, 2011, therapy record which showed that Thompson continued to experience left-sided

neck pain and noted a Work Ability Report from December 6, 2011, placing Thompson on further restrictions.  (Doc. 58-9, Ex. G at 13).

In his report dated January 23, 2012, Dr. Cederberg summarized Thompson's symptoms as "left-sided neck pain, headaches, and sense of being tired; and easy fatigability [and reported that Thompson] denied any prior history of concussion, neck or head injury."  (Doc. 58-9, Ex. G at 15).  Dr. Cederberg concluded that Thompson had sustained three distinct injuries as a result of the work incident on February 21, 2011: (1) a contusion to her scalp; (2) a neck strain; and (3) a mild closed head injury.  (Docs. 56, ¶ 55; 67, ¶ 55).  Dr. Cederberg noted in his examination that she had hyperreflexia in the lower extremities and stated that Thompson should have a repeat MRI scan of her neck and an MRI scan of her brain to rule out a subdural hematoma from the February 21, 2011 injury and to see if there was another injured region in the cervical spine that was not evidenced in the original MRI scan of her neck.  (Doc. 58-9, Ex. G at 15).  Dr. Cederberg expressed the opinion that Thompson was exhibiting objective findings on examination and that her February 21, 2011 injury was not yet resolved.  (Docs. 56, ¶ 56; 67, ¶ 56).

**Medical Treatment after First IME**

In accordance with Dr. Cederberg's recommendations, and those provided by Thompson's treating physician, Dr. Warren, Thompson continued to treat her injuries and underwent a second cervical MRI in June 2012.  (Docs. 56, ¶ 61; 67, ¶ 61).  On September 28, 2012, Integrity scheduled Thompson for a second IME with Dr. Cederberg for October 5, 2012.  (Doc. 66-5.)

**Second IME**

Thompson returned for a follow-up IME by Dr. Cederberg on October 5, 2012.  (Docs. 56, ¶ 62, 67, ¶ 62).  With regard to Thompson's medical history, Dr. Cederberg noted:

> I reviewed my prior report dated January 23, 2012.  In that report, I noted that she had diminished range of motion rotating her neck to the left and had hyperreflexia at the time I saw her in the lower extremities.  I diagnosed contusion to the scalp with neck strain and mild closed head injury.  Based on her findings in the lower extremities, I recommended she have a follow up MRI scan of her neck and an MRI scan of her brain to rule out some other type of intracranial process that would explain the hyperreflexia in her lower extremities.

(Doc. 58-9, Ex. G at 17).  As part of his October 5, 2012 exam, Dr. Cederberg reviewed additional medical records of Thompson's, including the June 21, 2012, MRI study following his first examination.  (Dos. 56, ¶ 63; 67, ¶ 63).  Dr. Cederberg noted that the MRI "showed degenerative disc disease at two levels without any evidence of spinal cord changes that would account for the

6

hyperreflexia in her lower extremities." (Doc. 58-9, Ex. G at 18). Dr. Cederberg noted that she was seen by Dr. Murunga at Avera Medical Group in August 2012 for neck pain and numbness in her fingers. (Doc. 58-9, Ex. G at 18). Dr. Cederberg noted that Dr. Warren felt that physical therapy had not been successful and referred Thompson to a chronic pain specialist for an epidural steroid injunction which was never performed. (Doc. 58-9, Ex. G at 18; Doc. 68, ¶ 13; 72-3, Ex. Q at 6). Dr. Cederberg reported that Thompson "feels exhausted," and has "left-sided headaches, global numbness in her left arm, and diminished movement in her neck." (Doc. 58-9, Ex. G at 18).

Dr. Cederberg also performed a physical examination of Thompson. He characterized Thompson as being "quite tearful" and found that Thompson had a diminished range of motion in her neck and tenderness on the left side of her neck. (Doc. 58-9, Ex. G at 18). Dr. Cederberg found that Thompson did not have hyperreflexia in her knees or ankles or in the lower extremities on this date. (Doc. 58-9, Ex. G at 18). He noted that Thompson's grip on the right hand averaged 40 pounds compared to unrecordable grip strength on the left and stated that there was no visible atrophy or discernible cause for the opposite left grip strength. (Doc. 58-9, Ex. G at 18).

Dr. Cederberg reiterated that the injury sustained by Thompson on February 21, 2011, was a contusion to the scalp, a mild closed head injury and a cervical strain superimposed on degenerative disc disease of the cervical spine. (Docs. 58-9, Ex. G at 19; 56, ¶ 65; 67, ¶ 65). He diagnosed her with "degenerative disc disease of the cervical spine with symptoms out of proportion to objective clinical and radiographic findings" and stated that the degenerative disc disease was unrelated to the February 21, 2011, injury. (Docs. 58-9, Ex. G at 19; 56, ¶¶ 66-67; 67, ¶¶ 66-67). Dr. Cederberg stated that when he examined Thompson, she did not have any objective findings that would correlate with her symptoms and that in his opinion, the injury from February 21, 2011, had been resolved. (Doc. 58-9, Ex. G at 19). Dr. Cederberg stated that "[b]ased on her persistent cervical spine complaint, [he] would rate [Thompson] as having a 0% permanent partial disability to the whole person." (Doc. 58-9, Ex. G). Dr. Cederberg stated that in his opinion, Thompson "does not require additional medical treatment, injections, physical therapy, medications or diagnostic evaluation of any kind as a result of the injury on February 21, 2011." (Doc. 59-9, Ex. G at 19). In his deposition, Dr. Cederberg explained why he arrived at the 0% permanent partial disability rating as follows: "I can't explain her symptoms. The findings on the MRI scan are mild. The mechanism of injury, in my opinion, is a trivial injury, and there's just

nothing objective that—that would correlate with her symptoms."  (Doc. 58-9, Ex. G, Cederberg Dep. 17:12-16).

**Medical Treatment after Second IME**

Not present in the record before this Court on summary judgment are many of Thompson's medical records after her second IME with Dr. Cederberg.  Although Plaintiff cites to the administrative law judge's findings of fact to show the medical care that Thompson received during this time, the Court is not obligated to give the administrative law judge's finding of fact any deference in evaluating Thompson's tort claim that was not litigated at the administrative level.  Thus, the findings of fact made by the administrative law judge may not serve as evidence to support the parties' factual assertions.

On October 29, 2012, Thompson saw Dr. Warren who noted that Thompson showed marked tenderness in her paraspinal muscles and over areas of the cervical spine, that Thompson showed limited range of motion, that her hand grasp, especially the left, was weak, and that she had pain radiating down her left arm.  (Doc. 72-3 at 9).  During that appointment, Dr. Warren also referred Thompson to Dr. Wilson Asfora, a neurosurgeon for consultation.  (Doc. 72-3 at 9).  Thompson's first consultation with Dr. Asfora was in November 2012.  (Doc. 66-1, Thompson Dep. 75:20-76:9).

**Denial of Benefits**

On or about December 21, 2012, Sedgwick gave notice to Thompson that National Union was denying all further workers' compensation benefits to Thompson related to the February 21, 2011 injury.  (Docs. 56, ¶ 68; 67, ¶ 68).  Sedgwick stated that that "[b]ased on Dr. Cederberg's opinions, JC Penney/National Union Fire Insurance Company is denying all further worker's compensation benefits to Ms. Thompson relating to her February 21, 2011 injury.  The denial includes the additional medical treatment recently requested, as well as any additional benefits under SDCL Title 62."  (Doc. 58-6, Ex. D at 6).  Prior to December 21, 2012, National Union had approved and paid for all treatment obtained by Thompson pursuant to the recommendations of her treating providers.  (Docs. 56, ¶ 69; 67, ¶ 69).

**Medical Treatment after Denial of Benefits**

On January 2013, Thompson visited Dr. Asfora who expressed that her symptoms may be associated with a condition called fibromyalgia/chronic pain syndrome.  (Docs. 66-1, Ex. A, Thompson Dep. 80:13-81:6; 58-11, Ex. I, Asfora Dep. 12:10-13:15).  In February 2013, upon Dr.

Asfora's recommendation, Thompson underwent a three-level cervical fusion surgery.  (Docs. 56, ¶ 70; 67, ¶ 70).

**Petition for Additional Workers' Compensation Benefits and Administrative Hearing**

On August 29, 2014, Thompson filed a Petition for Hearing with the South Dakota Department of Labor ("DOL") seeking additional workers' compensation benefits.  (Docs. 56, ¶ 71; 67, ¶ 71).  On September 2, 2014, Thompson filed an Amended Petition for Hearing.  (Doc. 63, 1-2).  In Thompson's Amended Petition, she sought additional workers' compensation benefits under South Dakota Codified Laws Title 62 for the following: (1) payment of all medical expenses in conjunction with treatment for her injuries under SDCL 62-4-1; (2) temporary total disability benefits under SDCL 62-4-3; (3) payment of permanent partial disability benefits under SDCL 62-4-6; (4) vocational retraining benefits and/or permanent total disability benefits under SDCL 62-4-6.1 and/or 62-4-53.  Doc. 64-1.  In addition, Thompson sought in her amended petition: attorney fees and costs incurred herein; prejudgment interest; post-judgment interest; and such other and further relief as the Department of Labor may deem just and equitable.  Doc. 64-1.   National Union filed an Answer to the Petition, denying that Thompson was entitled to any further benefits. (Docs. 56, ¶ 72; 67, ¶ 72).

On September 7 and 8, 2016, a hearing on Thompson's Petition was held before an administrative law judge with the South Dakota Department of Labor & Regulation.  (Docs. 58-14; 56, ¶ 74; 67, ¶ 74).  During the hearing before the DOL, Thompson was asked about her history of neck problems and related treatment prior to February 21, 2011, and she provided testimony regarding those issues.  (Docs. 56, ¶ 75; 67, ¶ 75).  At the hearing before the DOL, various medical professionals offered opinions as to the cause of Thompson's post-denial medical treatment. (Docs. 56, ¶ 76; 67, ¶ 76).  Thompson presented expert medical testimony from her family practice physician, Dr. Warren, and retained a physical medicine and rehabilitation specialist, Dr. Christopher Janssen.  (Docs. 56, ¶ 77; 67, ¶ 77).  Dr. Janssen's report and opinions in the workers' compensation litigation were not produced until January 2016, over three years following the December 21, 2012 denial.  (Docs. 56, ¶ 78; 67, ¶ 78).  At the hearing before the DOL, Dr. Janssen testified that he had not seen records showing Thompson's neck pain and prescriptions for pain medications prior to 2009.  (Docs. 56, ¶ 79; 67, ¶ 79).  At the hearing before the DOL, Dr. Janssen testified that his opinions were based, in part on his belief that "Dr. Asfora and Dr. Warren have both given the opinion that the injury was a major contributing factor to her continuing symptoms."

(Docs. 56, ¶ 80; 67, ¶ 80).  Dr. Warren testified that he was unaware of numerous neck injuries and chiropractic treatments for Thompson occurring between 2009 and 2011.  (Docs. 56, ¶ 81; 67, ¶ 81).  Dr. Warren also testified that it was not within the scope of his expertise to offer an opinion as to whether the degenerative condition shown in Thompson's July 2011 MRI would occur in a five to six month time period.  (Docs. 56, ¶ 82; 67, ¶ 82).

At the hearing before the DOL, JC Penney and National Union presented testimony from two surgeons, Dr. Cederberg and Dr. Asfora.  (Docs. 56, ¶ 83; 67, ¶ 83).  Dr. Asfora testified that degenerative disc disease is not an acute injury, but something that develops over a long period of time.  (Docs. 56, ¶ 84; 67, ¶ 84).  With respect to the specific degenerative disc disease observed on Thompson's July 2011 MRI, Dr. Asfora testified that the issue of causation was related to the severity of the incident.  (Docs. 56, ¶ 85; 67, ¶ 85).

On February 23, 2017, the Department of Labor issued a decision addressing the following legal issues: (a) Whether Thompson was injured to the extent she claims on or about February 21, 2011; (b) Whether Thompson is entitled to any worker's compensation benefits, including permanent total disability benefits, permanent partial disability benefits, temporary total disability benefits, and temporary partial disability benefits; and (c) Whether Thompson is entitled to prior and future medical benefits.  (Doc. 58-14).  In its decision, the Department of Labor and Regulation concluded that Thompson had demonstrated that she is permanently and totally disabled pursuant to SDCL 62-4-53.  (Doc. 58-14).  The administrative law judge granted Thompson's request for permanent total disability benefits.  (Doc. 58-14).  Noting that the weekly rate was in dispute, the administrative law judge ordered the parties to include their calculations in the findings of fact and conclusions of law.  (Doc. 58-14).  The administrative law judge further ordered that the Department will retain jurisdictions as to future and past medical benefits.  (Doc. 58-14).  Finally, the administrative law judge ordered both parties to submit Findings of Fact and Conclusions of Law and an Order consistent with the decision or a Stipulation as to a waiver of Findings of Fact and Conclusions of Law along with an Order consistent with the decision.  (Doc. 58-14).

Thompson and National Union submitted a Settlement Agreement with the Department on August 21, 2017.  (Doc. 64-2).  Therein, they agreed to a lump sum payment of $400,000.00 "in exchange for full release of all [Thompson's] worker's compensation claims, including temporary total disability, temporary partial disability, permanent total disability, permanent partial disability, retraining, rehabilitation, Odd-Lot, all appellate claims, and any and all other

claims arising out of her employment with JC Penney."  (Doc. 64-2).  The Settlement Agreement further provided that:

> It is agreed to by and between the parties that this settlement was entered into with the understanding that the lump sum payment of $400,000.00 represents the only award that [Thompson] will ever receive from Employer/Insurer with respect to the contested work related injuries alleged, and, therefore, should be allocated to that period of time extending from the date that [the Settlement] Agreement is executed . . . through the period of [Thompson's] life.  According to The Period Life Table, 2014, as published by the Social Security Administration, [Thompson], who . . . is presently fifty-four (54) year old, has a remaining life expectancy of 29.70 years or 356 months.  Dividing this number of months into the net settlement amount of $189,645.64 [ ] after deducting estimated attorney fees, estimated costs and medical bills, produced a monthly settlement rate of $553.11 [ ] as envisioned by, and agreed to, by [Thompson], [JC Penney] and [National Union].

(Doc. 64-2).  The Settlement Agreement provides that a Medicare Set-Aside will be submitted by JC Penney and National Union to the Center for Medicare and Medicaid Services (CMS) for approval in 30-45 days after receipt of an opinion letter from Thompson's treating physician, Dr. Warren.  (Doc. 64-2).  In the event the MSA is approved by CMS is an amount acceptable to JC Penney/National Union, the Settlement Agreement provides that JC Penney/National Union agrees to pay for primary and secondary future medical services related to the February 21, 2011 injury and "an immediate cash amount for seed money to be used for all reasonable, necessary and authorized medical expenses and to pay to an annuity company a lump sum to fund an annuity for the same purpose" which will pay annually a set amount to be used for all reasonable, necessary and authorized medical expenses over 25 years while Thompson is still living.  (Doc. 64-2).  In the event that the final recommended MSA that is approved by CMS exceeds the sums deemed acceptable by JC Penney/National Union, the Settlement Agreement provides that JC Penney/National Union "may elect to proceed by having [Thompson's] lifetime future medical remain in place, unaffected by th[e] settlement."  (Doc. 64-2).  Finally, the Settlement Agreement provides that the parties "have reached a settlement as to all the issues set forth in [Thompson's] Petition for Hearing," and that the parties agreement that the Petition "shall be dismissed with prejudice upon approval by the Department of Labor of th[e] Settlement Agreement."  (Doc. 64-2).

On August 21, 2017, the administrative law judge with the Department of Labor approved of the Settlement Agreement, finding that it "appear[ed] to be fair and reasonable to all parties."  Doc. 64-2.  The administrative law judge ordered that Thompson's "Petition for Hearing is

dismissed on its merits, with prejudice, each party bearing their costs and attorney's fees" and that Thompson's costs and attorney's fees (which the Settlement Agreement provided were to be deducted from $400,000.00 lump sum payment) were reasonable and granted.  Doc. 64-2.

**Present Lawsuit**

On January 25, 2018, Thompson filed a Complaint against National Union alleging that National Union breached its contract to provide workers' compensation benefits to Thompson and committed bad faith by terminating additional benefits to Plaintiff in December 2012.  (Doc. 1). With regard to her claim of bad faith, Thompson's Complaint alleges that "[National Union] knew that there was a lack of a reasonable basis for denial of the claim, or else acted in reckless disregard as to whether or not a reasonable basis existed for the denial of the claim."  (Docs. 56, ¶ 89; 67, ¶ 89).  With regard to her claim for breach of contract, Thompsons alleges the following:

> 29.  By virtue of its policy of worker's compensation insurance with JC Penney in effect on or about February 21, 2011, and Mrs. Thompson status as an insured under the policy, Defendant was contractually obligated to pay Plaintiff worker's compensation benefits as a result of her work related injury.
> 30.  Defendant breached its duty to pay Mrs. Thompson worker's compensation benefits in a timely manner pursuant to the policy.
> 31.  Defendant's breach of its duty to under it policy resulted in substantial damage to Mrs. Thompson.
> 32.    Defendant's refusal to pay the full amount of worker's compensation benefits as determined by the Department was vexatious and without reasonable cause and Plaintiff is entitled to attorney's fees pursuant to SDCL § 58-12-3.

(Doc. 1, ¶¶ 28-32).  In her Complaint, Thompson alleges that National Union had failed to pay Thompson's medical expenses or fully fund a Medicare Set-Aside Agreement (Doc. 1, ¶ 27). However, Thompson testified in her deposition that the Set-Aside was funded approximately one year after the parties' entered into the Settlement Agreement.  (Doc. 58-1, Ex. A, Thompson Dep. 91:16-25).

Pending before the Court is a National Union's Motion for Summary Judgment and Motion to Exclude Expert Testimony of Elliott Flood as well as Thompson's Motion to Exclude Expert Testimony of Robert Anderson.  The motions have been fully briefed by that parties.  Upon order of the Court, the parties also filed supplemental briefs on issues relating to National Union's Motion for Summary Judgment and held a hearing on all pending motions on March 18, 2021.  In her supplemental brief and at oral argument, Thompson withdrew her breach of contract claim and stated that Count 1 of her Complaint was limited to a claim for attorneys' fees under SDCL 58-

12-3.  At oral argument, the Court also ordered additional briefing on National Union's Motion to Exclude Testimony of Elliott Flood, as set out in his supplemental report dated June 28, 2020.

## DISCUSSION

### I.     Motion to Exclude Expert Testimony of Elliott Flood

#### A.  Background

National Union had moved to exclude testimony by Thompson's expert, Elliott Flood, that Dr. Cederberg was biased in favor of insurance companies and that Sedgwick knew or recklessly disregarded alleged evidence of bias.  (Doc. 59).

In his initial expert report dated September 30, 2018, Plaintiff's expert, Elliott Flood, stated that "the potential for bias in insurance medical examinations is a well-recognized concern in the insurance industry."  (Doc. 58-10, Ex. H at 12).  On January 23, 2020, Flood was deposed by counsel for National Union.  During his deposition, Flood was asked whether he intended to offer the opinion at trial that Dr. Cederberg was biased in favor of insurance companies.  Flood testified at that time that he did not intend to offer such an opinion:

> Q:     Okay.  Are you offering the opinion in this case that Dr. Cederberg is biased in favor of insurance companies?
> A:     If I've not written it in my report, I am not yet offering it.
> Q:     So my understanding, having read your report, is you are not currently offering that opinion.  Is that fair?
> A:     Yes.

(Doc. 58-10, Ex. H, Flood Dep. at 102:22-103:6).

On June 30, 2020, Plaintiff served National Union with the Supplemental Report of Elliott S. Flood.  (Doc. 58-16, Ex. N).  In his Supplemental Report, Flood indicates that since his deposition, he has reviewed additional 97 IME reports authored by Dr. Cederberg in other cases.  (Doc. 58-16, Ex. N. at 4).  These reports were provided to the parties by a third-party IME vendor pursuant to a subpoena.  (Doc. 60 at 2).  Prior to their production, the IME reports were redacted to remove all references to the examinee's name or personally identifiable information.  (Doc. 58-16).  Based on his review, Flood now intends to offer the following additional opinions at trial:

- As noted in my original report, Sedgwick denied any further benefits based on Dr. Cederberg's opinion.  The new materials received since my original report pertain to Dr. Cederberg's IME practice.  I was provided with redacted IME reports issued by Dr. Cederberg, of which 97 reached a conclusion.  Of those, 87 (90%) were adverse to the injured worker.  The new materials provide

additional support for my opinion that the use of Dr. Cederberg contravened the primary purpose of independent medical examinations, that is, to obtain a fair, objective, and unbiased evaluation of an injured worker's medical condition.

- My original report noted that industry standard requiring the claim handlers to investigate any concerns of bias by a supposedly independent reviewer. The new materials on Dr. Cederberg are precisely the type of information that should have been uncovered by any reasonable claim handler before relying on Dr. Cederberg to deny a claim. The materials show that Dr. Cederberg, in approximately 90% of his IME findings, supported the insurer's denial of claims. This is a gigantic red flag that any reasonable claim handler would have recognized indicated that Dr. Cederberg could not provided [sic] a reasonable basis to deny claims.

- This adds to my original opinion that Sedgwick was not providing the oversight and management required to fairly handle claims. In addition to the opinions expressed in my original report, it now appears that any reasonable claim handler would know that Dr. Cederberg was an unacceptable choice to render a fair, objective, and unbiased evaluation of an injured workers' medical condition.

(Doc. 58-16, Ex. N. at 4).

## B. Legal Standard

Proposed expert testimony must meet three prerequisites to be admissible under Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* Second, the proposed expert must be qualified. *Id.* Third, the proposed evidence must be "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.*

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 758 (8th Cir.2006). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted). However, an expert's opinion must be excluded if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (citation omitted). The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Lauzon*, 270 F.3d at 686 (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993)).

### C. Discussion

In his supplemental expert report, Flood stated that he was provided with redacted IME reports issued by Dr. Cederberg during discovery, of which 97 reached a conclusion.  Of those 97 reports, Flood concludes that 87 (90%) were adverse to the injured worker.  (Doc. 53-4).  Flood opines that it is industry standard for claims handlers to investigate any concerns of bias by physicians performing IME's and that a reasonable claims handler should have uncovered this information of potential bias by Dr. Cederberg and in doing so, would not have relied on his opinion in denying Thompson benefits.

National Union has moved to exclude Flood's opinion of Dr. Cederberg's alleged bias.  National Union contends that his opinion is not reliable because it assumes, without any factual basis, that the decisions by Dr. Cederberg that are allegedly "adverse" to the injured worker are a result of bias.  (Doc. 60 at 7).  National Union states that the reports examined by Dr. Cederberg are a small, self-selected sample and that Flood makes no attempt to identify other IME reports authored by Dr. Cederberg before December 21, 2012—the time of Thompson's denial.  (Doc. 60 at 7).  National Union also argues that Flood's opinion that Dr. Cederberg was incapable of "a fair, objective, and unbiased evaluation" is contradicted by the evidence in this case because Dr. Cederberg's findings following his initial examination of Thompson were favorable to Thompson.  (Doc. 60 at 7-8).  National Union highlights that it was only following Dr. Cederberg's second examination of Thompson on October 5, 2012, that Sedgwick denied additional workers' compensation benefits.  (Doc. 60 at 8).

Also weighing against admissibility, National Union argues, is the fact that the majority of the 97 IME reports upon which Flood bases his opinion of bias were issued after National Union denied Thompson benefits.  (Doc. 60 at 8).  National Union states that according to Flood's supplemental report, 72 of the 97 IME reports reviewed were authored by Dr. Cederberg after he issued his first IME report favorable to Thompson, and 59 of the 97 reports were authored after Sedgwick issued its denial to Thompson 9 months later.  (Docs. 60 at 8; 53-4).  National Union argues that as a result, the majority of these IME reports are not relevant to the question of whether Sedgwick had knowledge of Dr. Cederberg's alleged bias at the time it denied Thompson benefits.  (Doc. 60 at 8).

As noted above, National Union argues that IME reports authored by Dr. Cederberg and examined by Flood that were adverse to workers' compensation claimants are not reliable evidence

of bias because Flood did not examine the specific facts and claims related to each examinee.  In support of its argument, National Union cites to *Bronick v. State Farm Mut. Auto. Ins. Co.*, Civ. No. 11-1442, 2013 WL 3716600 (D. Ariz. Jul. 15, 2013).  In *Bronick*, the plaintiff had argued, similar to Thompson in this case, that the insurance company intentionally[1] hired the IME physician to prepare a biased IME report in its favor based on the fact that only five of 151 IMEs previously performed by the physician favored the patients.  *Id.* at \*9-10.  The district court excluded such testimony, in part, on the basis that:

> [H]ad Defendant done what Plaintiff suggests it should have done, it would still be irrelevant to the ultimate question of whether Defendant hired a biased physician. As discussed above, whether Dr. Hartzler has found for defendant insurers in the past is irrelevant to whether he is unfair and biased, the central question regarding bias is whether Dr. Hartzler has performed unfair and biased IMEs in the past. Under Plaintiff's reasoning, Defendant would be expected to do what [Plaintiff's expert] failed to do in his report, and Defendant would be expected to cull the facts of all 151 prior cases that Dr. Hartzler has been hired to do an IME in and determine whether the facts of each of those cases shows Dr. Harzler acted unfairly and biased toward a defendant.

*Id.* at \*10-11.  This Court declines to adopt the reasoning used in *Bronick*.  The admissibility of bias evidence is more nuanced than *Bronick* suggests.  If only 5 of 151 IMEs previously performed by the physician favored the patients, that can be relevant evidence on whether or not a physician is biased.  However, whether or not a physician is biased in favor of insurance companies is not relevant to a claim for bad faith denial of workers' compensation benefits under South Dakota law if there is no corresponding evidence that the insurer knew or recklessly disregarded evidence of physician bias.  In South Dakota, to show a bad faith denial of workers' compensation benefits, the plaintiff must demonstrate not only that there is an absence of a reasonable basis for denial of policy benefits; but also that the insurer knew or recklessly disregarded the lack of a reasonable basis for denial.  *See Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007).  Likewise, an insurer cannot recklessly ignore evidence which suggests bias.

In the present case, Thompson argues that Dr. Cederberg's second IME report did not provide National Union with a reasonable basis upon which to deny Thompson additional workers' compensation benefits because, she argues, there is evidence that Dr. Cederberg is biased in favor

---

[1] The Court notes that in this case, Thompson does not contend that National Union intentionally hired a Dr. Cederberg to prepare a biased IME report.  Instead, Thompson contends that National Union recklessly disregarded evidence of bias by Dr. Cederberg.

of insurance companies.  Thompson relies on the opinion of Flood who examined 97 redacted IME reports issued by Dr. Cederberg in other cases, 87 (90%) of which were adverse to the injured worker.  As the Court has already stated, evidence that an IME physician has made findings adverse to claimants in a significant majority of IMEs performed may be relevant to the issue of bias.  However, the Court finds that there is no evidence in the record suggesting that prior to retaining Dr. Cederberg to evaluate Ms. Thompson, National Union knew or recklessly disregarded evidence of any potential bias by Dr. Cederberg.  For example, there is no evidence that Dr. Cederberg had performed IME's for National Union in the past.  In this case, Sedgwick contacted Integrity, a third-party vendor, and requested that a qualified physician examine Thompson.  Integrity assigned Dr. Cederberg.  Ms. Talbot, the Sedgwick claims adjuster, testified that she does not recall using Dr. Cederberg prior to Thompson's case.  There is no evidence that National Union had any knowledge of the IME opinions that Dr. Cederberg had given when retained by other insurance companies, nor did National Union inquire.[2]

The question in this case is not whether Dr. Cederberg was biased.  Indeed, Thompson does not argue that because of Dr. Cederberg's alleged bias, National Union was reckless in relying upon all of Dr. Cederberg's IMEs of Thompson, including the first IME report that was favorable to her.  Rather, the issue in this case is whether it was reckless for National Union to not inquire into the question of medical examiner bias before cutting off benefits when the second IME by the same physician was decidedly different than his first IME with arguably no clear explanation for the change in opinion.  Since the question is not whether Dr. Cederberg was biased, neither Flood nor Anderson will be permitted to give any opinion on that point.  The Court does not reach the question of whether either expert witness could give an opinion on bias if Dr. Cederberg's bias was a relevant issue.

In the civil context, 'recklessness' encompasses an objective standard—specifically, '[t]he civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act

---

[2] The Court notes that the majority of the IME reports by Dr. Cederberg that were examined by Flood were issued after National Union rendered its decision denying Thompson benefits.  72 of 97 of these IMEs were authored after Dr. Cederberg conducted his first IME of Thompson and 59 of the 97 IMEs cited to by Flood were issued after Dr. Cederberg issued his second IME.  As the Court stated at oral argument, IME reports issued by Dr. Cederberg after National Union denied Thompson benefits are irrelevant to the issue of bad faith which must be determined based on the facts available to National Union at the time of the denial.  *See Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 70 (S.D. 1996).

in the face of an unjustifiably high risk of harm that is either known or so obvious that is should be known. *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)); *see also* Restatement (Second) of Torts § 500. The Restatement (Second) provides that recklessness may consist of either of two different types of conduct.

> In one the actor knows, or has reason to know, . . . of facts which create a high degree of risk of [] harm to another, and deliberately proceeds to act, or fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reasons to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable [person] in his position would do so.

Restatement (Second) of Torts § 500. A question in this case exists as to whether National Union knew or had reason to know after Dr. Cederberg's second IME report that there was an unjustifiably high risk that Dr. Cederberg's second IME report was biased such that it did not, without further inquiry, provide a reasonable basis upon which to deny Thompson further workers' compensation benefits. National Union through its agent Sedgwick was aware that in his first IME report, Dr. Cederberg had a favorable opinion in support of Thompson. National Union through its agent Sedgwick was also aware that they had not provided Thompson's previous medical history to Dr. Cederberg. Then without any other cause to do so, National Union cuts off benefits to Thompson after receiving a second IME report from Dr. Cederberg. The second IME report was decidedly negative toward Thompson with no real explanation why. When a question of IME examiner bias is presented, an insurer need not always examine all previous IME reports of the physician. National Union correctly points out that at the time of the second IME that information would not be available. However, the IME physician could be asked for at least his own compilation of what percentage of time he essentially finds in favor of or against the claimant on IMEs. In this case, there is enough evidence to present a fact question to the jury on whether or not it was reckless for National Union through its agents to not inquire into bias on the part of Dr. Cederberg before denying all further benefits on the basis of his second IME report. The Court cannot say as a matter of law that under the facts there is no issue of reckless action or inaction.

Even though a fact question is presented, that does not necessarily mean that Flood, or for that matter Anderson, can testify as to their opinions on that fact question. The question is not was Dr. Cederberg biased, but rather was the insurer reckless in not inquiring as to whether or not Dr. Cederberg was biased after obtaining his second IME opinion and relying on it, apparently exclusively, in denying benefits. It is the Court's position that under some circumstances an

insurer has a duty to inquire as to whether or not an IME examiner is biased in favor of insurers. A claimant seeking bad faith damages has a high hurdle to cross before proving liability. It is not a question of whether the insurer was negligent, but instead, whether the insurer was reckless under the set of facts presented, in not making inquiry into potential bias on the part of the IME examiner. The Court, not the expert witnesses, will instruct the jury on the law. Each expert witness has different involvement in the insurance industry. The perspective of each may be of assistance to the jury in deciding whether or not it was reckless for National Union to fail to inquire into potential basis on the part of the IME examiner before denying further benefits on the basis of Dr. Cederberg's second IME report.

## II. Motion to Exclude Expert Testimony of Robert Anderson

National Union seeks to introduce Robert Anderson as an expert in order to show that it was reasonable for National Union to rely on Dr. Cederberg, a Minneapolis, Minnesota, doctor to perform an IME on Thompson in Sioux Falls, South Dakota. Mr. Anderson opines in his report that it is difficult to obtain IME doctors in South Dakota and that therefore it was reasonable for National Union to rely on an out-of-state physician to conduct an IME. Mr. Anderson also opines in his report that National Union reasonably exercised its statutory right to obtain an IME and that under the facts and circumstances, reasonably relied on the opinion of Dr. Cederberg in ultimately denying Thompson further workers' compensation benefits.

Mr. Anderson has been a partner with the May, Adam, Gerdes & Thompson law firm in Pierre, South Dakota since 1982. (Doc. 53-2, Anderson Dep. 5:22-6:9). At the time of his deposition, approximately 20 percent of his caseload was workers' compensation cases although he testified that this type of work used to comprise a greater percentage of his caseload. (Doc. 53-2, Anderson Dep. 6:10-22). Anderson testified that he had also mediated approximately 400 workers' compensation cases. (Doc. 53-5 at 2). As part of his law and mediation practice, Anderson has experience trying to locate and hire physicians to conduct IME's in South Dakota and has had numerous discussions with claims handlers and other attorneys regarding the difficulties in obtaining IME's in South Dakota. (Doc. 53-5 at 2). In his expert report, Anderson opines that because it was difficult to obtain IME doctors within Sioux Falls, South Dakota area, it was reasonable for National Union to rely upon Dr. Cederberg to conduct the IME in Thompson's worker's compensation case. (Doc. 53-5).

Thompson has moved to exclude Anderson's proffered testimony on the difficulty of hiring IME physicians in South Dakota on the basis that it lacks sufficient reliability and should be excluded.  (Doc. 54 at 4).  Thompson argues that Anderson's opinion that a "small and shrinking pool of willing and eligible physicians" made it difficult for National Union to procure an IME from a doctor in South Dakota is not based on sufficient facts or data, nor on reliable principles and methods.  (Doc. 54 at 5).  In support of her argument, Thompson notes that Anderson's opinion is not based on any documents or publications related to the standards or best practices in the industry.  (Doc. 54 at 6).  In addition, she notes that Anderson did not conduct an independent search for physicians who performed IME's in South Dakota while Thompson's workers' compensation claim was pending and was unfamiliar in his deposition with several physicians who were performing IME's in the Sioux Falls area at the time.  (Doc. 54 at 6).  Thompson argues that instead, Anderson based his conclusion on his "own dealings with insurers, his own cases during this time frame, and his conversations with other lawyers, health care providers, and doctors trying to find people to perform IME's throughout his career."  (Doc. 54 at 5-6).  Thompson argues that Anderson's opinion is unreliable because it is based on his own "subjective assumptions" rather than on facts and data.  (Doc. 54 at 6).

In South Dakota, to show a bad faith denial of workers' compensation benefits, the plaintiff must demonstrate that (1) there is an absence of a reasonable basis for denial of policy benefits; and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denial.  *See Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007).  In support of her bad faith claim, Thompson's expert, Flood, opines that it is unreasonable for an insurance company to rely on an out of town IME doctor unless there are no local IME physicians available.  At trial, National Union seeks to introduce the opinion of its expert, Anderson, as rebuttal testimony to educate the jury on the difficulty in obtaining IME doctors in South Dakota and to opine that it was thus reasonable for National Union to rely on an out-of-state physician to conduct an IME.  During oral argument on this motion, the Court inquired whether there was any evidence regarding whether the claims administrator for Sedgwick had knowledge of any difficulties in obtaining qualified IME physicians in South Dakota and both parties agreed that there was no such evidence in the record. The Court concludes, then, that evidence regarding the potential lack of availability of qualified, local IME physicians is not relevant to the issue of bad faith since there is no evidence in the record that Sedgwick attempted to hire a physician locally or that any possible lack of availability of local

IME physicians factored into Sedgwick's hiring decision.  The evidence simply shows that Sedgwick exercised its statutory right to have Thompson submit to an IME exam and contacted Integrity to locate and hire a qualified physician to perform the exam.  Any evidence by either Anderson or Flood regarding the availability of or difficulty in finding local IME physicians is not relevant to Thompson's bad faith claim because Sedgwick never considered the availability of South Dakota IME examiners in its hiring of an IME physician.  Flood will be able to testify why it is desirable to have a local IME physician examiner.  However, if Flood proceeds to testify that it was unreasonable for National Union to rely on out-of-state physicians assuming they were available as was the case with his written opinion, Anderson may offer rebuttal testimony on the difficulty of hiring qualified, local IME physicians.  Anderson, in any event, will be permitted to offer his opinion that National Union reasonably exercised its statutory right to obtain an IME and that under the facts and circumstances, reasonably relied on the opinion of Dr. Cederberg in ultimately denying Thompson further workers' compensation benefits.  The Court finds that Anderson is qualified to testify to such matters and that his knowledge about and experience in litigating and mediating workers' compensation cases in South Dakota will aid the jury in its understanding of this issue.

II.    **Summary Judgment**

    A.  **Bad Faith Claim**

        1.  **Legal Standard**

In South Dakota, to show a bad faith denial of workers' compensation benefits, the plaintiff must demonstrate that (1) there is an absence of a reasonable basis for denial of policy benefits; and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denial.  *See Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007).  "[K]nowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured."  *Champion v. U.S. Fidelity & Guar. Co.*, 399 N.W.2d 320, 324 (S.D. 1987).  It is well established that an insurer may "challenge claims which are fairly debatable," and thus will only be liable for bad faith when the insurer "has intentionally denied (or failed to process or pay) a claim without a reasonable basis."  *Hein*, 731 N.W.2d at 236.  As the South Dakota Supreme Court held in *Dakota, Minnesota & Eastern Railroad Corp. v. Acuity (DM&E)*:

> If an insured's claim is fairly debatable either in fact or law, an insurer cannot be said to have denied the claim in bad faith.  The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish that the insurer had a reasonable basis to deny the claim.  The focus is on the existence of a debatable issue, not on which party was correct.

771 N.W.2d 623, 630 (S.D. 2009) (citation omitted).  Whether an insurer acted in bad faith is determined based upon the facts and law available to the insurer at the time it made the decision to deny coverage.  *Id.* at 629.

A "plaintiff's bad faith claim survives summary judgment only if [the] defendant had no reasonable basis" to discontinue benefits.  *See Johnson v. Acuity Mut. Ins. Co.*, Civ. No. 18-5076, 2020 WL 1444962, at *6 (D.S.D. Mar. 25, 2020) (J. Viken).  "If the record shows no genuine dispute that a reasonable basis existed for the denial, [a] defendant is entitled to summary judgment."  *Id.*; *see also Arp v. AON/Combined Ins. Co.*, 300 F.3d 913, 917 (8th Cir. 2002) (citing *Ulrich v. St. Paul Fire & Marine Ins. Co.*, 912 F.2d 961, 963 (8th Cir. 1990) ("In order to withstand the motion for summary judgment, the Arps were required to create an issue of material fact concerning whether AON had a reasonable basis for denying their claims.")); *Case v. Toshiba Am. Info. Sys., Inc.*, 7 F.3d 771, 773 (8th Cir. 1993) (citing *Ulrich*, 912 F.2d at 963).  The parties do not appear to dispute that Sedgwick was the agent acting on behalf of National Union at all relevant times, and that any tortious action by Sedgwick is imputed to National Union.  *See also Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 773 (S.D. 2002) (citing *Restatement (Second) of Torts* §876(b)) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."); *see also Fair v. Nash Finch Co.*, Civ. No. 11-5005, 2012 WL 13173043, at *15 (D.S.D. Oct. 30, 2012) (J. Duffy) (holding that a self-insured employer that hired Sedgwick to administer its workers' compensation claims on its behalf may be held liable, under a vicarious liability theory, for the foreseeable acts of Sedgwick which were done in whole or part to further the employer's business interests), *report and recommendation adopted in relevant part*, 2013 WL 1241201, at *4 (D.S.D. Mar. 25, 2013).

## 2. Analysis

National Union has moved for summary judgment on Thompson's bad faith claim.  In opposition to National Union's motion for summary judgment, Thompson argues that questions of fact exist as to whether National Union knew or recklessly disregarded a lack of a reasonable

basis to deny Thompson benefits.  Specifically, Thompson argues that a jury question exists as to whether Dr. Cederberg's October 2012 IME report provided Sedgwick with a reasonable basis to deny Thompson benefits in light of: (1) Thompson's unabated need for treatment after her work injury and Dr. Cederberg's first IME report finding Thompson's work injury compensable; (2) Sedgwick's knowledge that Dr. Cederberg had not considered whether Thompson's work injury was a major contributing cause of her disability in light of her history of back and neck pain; and (3) the opinions of Thompson's treating physicians that her work injury was a major contributing cause of her condition.  (Doc. 69).

At the outset, the Court notes that although both parties cited to expert opinions by Dr. Asfora, Dr. Warren, and Dr. Janssen in support and in opposition to whether National Union's denial was in bad faith, the Court must base its determination on the facts and law available to Sedgwick/National Union at the time of the benefits denial on December 21, 2012.  *DM&E*, 771 N.W.2d at 629.  The opinions of these experts were produced after the National Union issued its decision denying Thompson further workers' compensation coverage and may not be considered by the Court in determining whether a jury question exists as to Thompson's bad faith claim.  *See DM&*E, 771 N.W.2d at 631-32 (stating that the deposition of the plaintiff's attorney and plaintiff's actions at the summary judgment and directed verdict stages of the case were "insufficient to show that the claim was fairly debatable *at the time [the defendant] made its decision to deny the claim*.").

The Court concludes that a jury question exists as to whether Dr. Cederberg's opinion provided National Union with a reasonable basis upon which to deny benefits and if so, whether National Union knew or recklessly disregarded such a lack of reasonable basis for the denial.  In January 2012, after noting in his IME report that he had reviewed Thompson's MRI showing mild degenerative disc disease, Dr. Cederberg opined that Thompson's February 2011 work injury was the cause of the symptoms she was experiencing at that time.  Despite the fact that Thompson continued to experience and treat such symptoms since the date of her injury, Dr. Cederberg concluded approximately 9 months later during his second IME of Thompson that Thompson's symptoms were no longer a major contributing factor to her condition, attributing her condition to the pre-existing degenerative disc disease evidenced in her June 2012 MRI—a condition which Dr. Cederberg had not found to be significant at the time of his first IME and which, in his second IME report, Dr. Cederberg acknowledged did not fully explain the symptoms Thompson was

experiencing. (Doc. 58-9) ("Her current diagnosis is degenerative disc disease of the cervical spine with symptoms out of proportion to objective clinical and radiographic findings."). Dr. Cederberg was not provided any of Thompson's medical records prior to her work injury and thus had not considered whether her work injury may have aggravated or combined with her other neck and back injuries and degenerative disc disease to produce the disability for which she sought compensation. *See St. Luke's Midland Regional v. Kennedy*, 653 N.W.2d 880, 884-85 (S.D. 2002) ("A pre-existing medical condition or infirmity does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the condition or infirmity to produce the disability for which compensation is sought."). Thompson had not required such extensive medical treatment prior to her February 2011 injury, nor had she previously had difficulty engaging in everyday functions. Based on these facts, the Court concludes that a reasonable jury could find that Dr. Cederberg's opinion did not provide a reasonable basis to deny Thompson benefits and that National Union knew or recklessly disregarded a lack of a reasonable basis for the denial. *See Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007). Accordingly, National Union's Motion for Summary Judgment on Thompson's claim for bad faith is denied.

### B. Attorney's Fees Under SDCL 58-12-3

Thompson alleges that National Union had a contractual duty under the policy to pay her workers' compensation benefits and that its breach of such duty was vexatious and without reasonable cause, entitling her to attorney's fees pursuant to SDCL 58-12-3.

National Union argues that Thompson's claims for breach of contract and attorney's fees under SDCL 58-12-3 are barred by release. The Settlement Agreement in this case provides that the "Claimant and Insurer have agreed to a lump sum payment of Four Hundred Thousand Dollars ($400,000.00), in exchange for full release of all her workers' compensation claims . . ." and for a net settlement amount of $189,645.64 after deducting estimated attorney fees, estimated costs and medical bills." (Doc. 64-2). The administrative law judge entered an order approving the Settlement Agreement and finding that costs and attorney's fees referenced therein to be reasonable. (Doc. 64-2). National Union contends that the breach of contract claim is the same claim that was litigated at the administrative level and that Thompson released National Union from further liability for such claim. National Union contends that attorney's fees were accounted for in the Settlement Agreement and that Thompson may not now get a "second bite at the apple."

In response, Thompson contends that her claim that National Union's refusal to pay workers' compensation benefits was vexatious or without reasonable cause is independent of her workers' compensation claim and was not subject to the release. (Doc. 69 at 29.). This Court disagrees, as explained more fully below.

SDCL 58-12-3 provides that in an action or proceeding against an insurance company on any policy or certificate of insurance:

> [i]f it appears from the evidence that such company . . . has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause, the Department of Labor and Regulation, the trial court and the appellate court, shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as part of the costs.

SDCL 58-12-3. A claimant must petition for a hearing on attorney's fees under SDCL 58-2-3 no later than 10 days after a judgment or award is rendered for the claimant, and the Department of Labor or a court[3] must make a separate determination as to whether the insurer's refusal to pay the loss was "vexatious or without reasonable cause." *See* SDCL 58-12-3.1.[4]

Section 58-12-3 "is remedial in nature, designed to recompense a claimant for the legal expenses incurred when an insurance company unreasonably forces the claimant to resort to litigation to obtain contractual benefits." *Tripp v. Nat'l Mut. Ins. Co.*, 664 F.3d 1200, 1206-07 (8th Cir. 2011). In the context of workers' compensation, the benefits sought by a claimant are pursuant to the workers' compensation statutes and the contract that an insurer has with an employer to provide such benefits to employees. A claimant's entitlement to workers'

---

[3] SDCL 58-12-3 is not limited to workers' compensation insurance policies and applies to "any policy or certificate of insurance."  SDCL 58-12-3.

[4] Specifically, SDCL 58-12-3.1 provides that,

> The determination of entitlement to an allowance of attorney fees as costs and the amount thereof under 58-12-3 shall be made by the court or the Department of Labor and Regulation at a separate hearing of record subsequent to the entry of a judgment or award in favor of the person making claim against the insurance company, and, if an allowance is made, the amount thereof shall be inserted in or added to the judgment or award.  Such a hearing shall be afforded upon request of the claimant made within ten days after entry of the judgment or award.

SDCL 58-12-3.1; *see also Lewis v. State Dept. of Transp.*, 667 N.W.2d 283, 290-91 (S.D. 2003), overruled on other grounds, *Wells v. Howe Heating & Plumbing, Inc.*, 677 N.W.2d 586 (S.D. 2004) ("The plain language of SDCL 58-12-3.1 [ ] requires a request for attorney fees within ten days of entry of a favorable judgment or award. . . .").

compensation benefits is a determination that must be made by the Department of Labor in the first instance, although its decision is subject to judicial review.  If the Department concludes that a party failed to honor its obligation to provider workers' compensation benefits, whether or not its refusal to pay workers' compensation benefits was vexatious and without reasonable cause is a question of fact, *Biegler v. Am. Family Mut. Ins. Co.*, 621 N.W.2d 592, 606 (S.D. 2001), that also must be made by the Department of Labor in the first instance upon petition of the claimant made within 10 days upon receiving a favorable award.  *See* SDCL 58-12-3.1; *Hollman v. Dale Electronics*, 298 N.W.2d 177, 178 (S.D. 1980) (remanding to the Department of Labor to conduct a hearing on attorney's fees sought under SDCL 58-12-3 when claimant's petition request such fees and when claimant renewed her request 3 days after the Department granted claimant's workers' compensation claim); *Howie v. Pennington County*, 563 N.W.2d 116, 117 (S.D. 1997) (involving a claimant who filed a petition for attorney's fees with the Department of Labor in a workers' compensation case after receiving a favorable award from the Department); *Johnson v. Skelly Oil Co.*, 359 N.W.2d 130, 132, 135 (S.D. 1984) (affirming the Department of Labor's decision denying attorney's fees under SDCL 58-12-3 after the Department conducted a separate hearing on the issue).

In the present case, Thompson prevailed at the administrative level when the administrative law judge found Thompson was entitled to benefits under the workers' compensation statutes and pursuant to the insurance policy by and between JC Penney and National Union.  The administrative law judge entered her decision finding that Thompson was permanently and totally disabled, granting her permanent total disability benefits, and retaining jurisdiction as to past and future medical benefits.  Subsequently, the parties entered a Settlement Agreement providing for a lump sum payment to Thompson less costs and attorney's fees in exchange for a full release by Thompson of all her workers' compensation claims.  On August 21, 2017, an order was entered by the administrative law judge approving the Settlement Agreement, thus giving it the same force and effect as an adjudicated award.  *See Leichtnam v. Am. Zurich Ins. Co.*, Civ. No. 15-5012, 2019 WL 5870367, at *4 (D.S.D. Aug. 28, 2019) (report and recommendation) (quoting *Sopko v. C & R. Transfer Co.*, 575 N.W.2d 225, 229 (S.D. 1998) ("Compromise agreements permitted under SDCL 62-7-5 have the same force and effect as adjudicated awards.")); *see also Ball v. Fed. Ins. Co.*, Civ. No. 18-4008, 2019 WL 5191679, at *3 (D.S.D. Oct. 15, 2019) (finding that the settlement agreement entered into by the parties and approved by the Department of Labor to be a

compensation agreement contemplated under SDCL 62-7-5 carrying the same force and effect as an adjudicated award).  Thompson did not attempt to pursue a claim for attorney's fees under SDCL 58-12-3 within the 10-day period prescribed by statute, SDCL 58-12-3.1.  Thompson is now precluded from recovering such fees from this Court.

The Court concludes as well that Thompson's claim for attorney's fees under SDCL 58-12-3 is barred by the defense of release.  In her Complaint, Thompson alleges that National Union breached its contractual duty to pay Thompson workers' compensation benefits as a result of her work-related injury.[5]  Thompson's claim alleging a failure to honor an obligation to pay workers' compensation benefits falls within the exclusive jurisdiction of the Department of Labor, is the exact claim that was litigated at the administrative level and which Thompson released National Union from all further liability.  By releasing National Union from any further liability for this claim, Thompson also released any claim that National Union's breach of its obligation to pay workers' compensation benefits was vexatious or without reasonable cause.

Thompson has not provided the Court with any cases showing that federal courts may award a claimant attorneys' fees under SDCL 58-12-3 if an insurer vexatiously or without reasonable cause refused to pay workers' compensation benefits.  The parties in this case were both represented by counsel at the administrative level.  Under the plain and unambiguous language of the Settlement Agreement, Thompson fully released National Union from all liability for its workers' compensation claims and the Court concludes that this release encompasses any claim that National Union's denial of benefits was made vexatiously or without reasonable cause in violation of its contractual and statutory duties.

To the extent that Thompson is seeking to recover attorney's fees under SDCL 58-12-3 for litigating its bad faith claim before this Court, such fees are plainly unrecoverable under South Dakota law.  *See Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 763 (S.D. 1994) ("A bad faith claim 'is tortious in nature i.e., for the wrongful refusal to settle within the policy limits of its insured,' and not an action against an insurance company on a policy of insurance within the contemplation of SDCL 58-12-3.") (quoting *Crabb v. Nat'l Indem. Co.*, 205 N.W.2d 633, 639 (S.D. 1973)).

---

[5] In her supplemental brief, Thompson stated that she is withdrawing her breach of contract claim, but argues that attorneys' fees are recoverable for vexatious refusal to pay workers' compensation benefits even if a breach of contract claim is not pending in the present action.  The Court disagrees for the reasons discussed in this Opinion.

For these reasons, National Union's Motion for Summary Judgment on Thompson's breach of contract claim and claim for attorney's fees under SDCL 58-12-3 is granted.

Accordingly, it is hereby ORDERED that:

1) National Union's Motion to Exclude Expert Testimony of Elliott Flood (Doc. 59) is GRANTED IN PART; Flood is precluded from offering an opinion that it was unreasonable for National Union to rely on Dr. Cederberg's opinion in denying Thompson benefits on the basis that Dr. Cederberg was biased in favor of insurance companies;

2) Thompson's Motion to Exclude Expert Testimony of Robert Anderson (Doc. 52) is GRANTED IN PART and DENIED IN PART; Anderson will not be allowed to offer his opinion on the difficulty of hiring qualified, local IME physicians unless Flood opens the door to such rebuttal evidence;

3) National Union's Motion for Summary Judgment (Doc. 55) is GRANTED IN PART AND DENIED IN PART as follows:
   a. DENIED as to Thompson's bad faith claim;
   b. GRANTED as to Thompson's breach of contract and claim for attorneys' fees under SDCL 58-12-3.

Dated this 17th day of May, 2021.

BY THE COURT:

_____
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

_____